THE STATE OF KANSAS, ex rel. JOHN S. DAWSON, as Attorney-general, etc., *Appellant*, v. GEORGE INNES et al., as the Board of Education of the City of Lawrence et al., *Appellees.*

No. 18,250.

SYLLABUS BY THE COURT.

1. TEXTBOOKS—*Uniformity—Requirements of the Statute.* The uniformity act (Laws 1907, ch. 179, Gen. Stat. 1909, §§ 7810-7838) requires the use of the same textbooks in all the schools, in order to lessen the expense while insuring the quality.

2. ——— *Boards of Education—No Power to "Adopt" Textbooks.* The board of education of a city has no power to adopt and use in its schools other books than those adopted by the state textbook commission, except such proper books of reference as may reasonably be used as such.

3. INJUNCTION—*Use of Textbooks Not Adopted by Commission.* It was admitted and shown that the defendants had "adopted" and were using other and costlier readers than those prescribed by the commission, practically in the same manner as if they had all been regularly and lawfully adopted. *Held,* error to refuse an injunction against the continuance of such practice.

Appeal from Douglas district court. Opinion filed March 8, 1913. Reversed.

*John S. Dawson,* attorney-general, for the appellant; *Hugh T. Fisher,* of Topeka, of counsel.

*William E. Higgins,* and *James H. Mitchell,* both of Lawrence, for the appellees.

The opinion of the court was delivered by

WEST, J.: This action was brought by the state on the relation of John S. Dawson, attorney-general, to enjoin the board of education and superintendent of schools of the city of Lawrence from adopting, using or permitting to be used certain unadopted textbooks. The petition alleged that the textbook commission had

adopted certain readers for the first, second, third, fourth and fifth grades, the maximum prices fixed being ten, seventeen, twenty-three, thirty and forty cents, respectively; that the defendants had adopted certain textbooks, and were using them and permitting them to· be used, including Ward's First Reader and Ward's Second Reader, costing forty and forty-five cents, respectively, instead of ten and seventeen cents, the cost of the adopted readers. The answer admitted that the defendants had adopted and were using and permitting to be used the books named in the petition, including Ward's Primer and Ward's First and Second Readers. The answer, among other things, further alleged that the textbooks adopted by the textbook commission were sufficient to occupy the time of the pupils for only five or six months of the school year, and insufficient to accomplish the teaching of words, the mechanics of reading and the simplest expressions of English and of good literature to the extent desired by the board of education, and that if restricted to the use of the adopted texts pupils would be greatly harmed in their development of a vocabulary, in learning the "mechanics of reading," etc., "Wherefore the said board of education has adopted and is using and permitting· to be used in connection with the said readers adopted by the State Textbook Commission, and with reference to the matter therein contained. . . . Ward's Primer, and Ward's First and Second Readers"; that by direction of the board of education, and with its consent, the additional work of instruction and reading in the first and second grades was formulated either as introductory or supplementary to the matter contained in the adopted books, and that the state board of education had adopted and authorized the use of· state textbooks supplementary to those adopted by the commission. The court made findings of facts in accordance with these allegations and admissions, and found also that the attorney-general and department.

of public instruction had construed the textbook law as giving permission to use supplementary readers if the adopted books were used in good faith; that if restricted to the adopted books the pupils would be greatly hindered and would suffer loss in their development of a vocabulary, in the mechanics of reading, such as enunciation, pronunciation, expression and the like, in acquainting themselves with the simpler expressions of English, etc. As a conclusion of law, it was decided that to enjoin the defendants as prayed for would be most harmful to the school children and a most unconscionable exercise of the equity powers of the court. The injunction was therefore denied, and the defendants given judgment for costs. The plaintiff appeals.

Section 7813 of the General Statutes 1909 empowers the textbook commission to select and adopt a uniform series of school textbooks for use in the public schools in certain named branches, including reading, and section 7815 fixes the maximum prices for first and second readers at ten and seventeen cents, respectively. Section 7822 authorizes the school district, by a vote at an annual meeting, to purchase, own and furnish textbooks as provided in the act, for use in the schools, free of charge to the pupils. Section 7824 requires the contract made by the textbook commission to be for five years each, and provides that no school-district board or board of education of any city of the first and second class shall adopt, use or permit to be used any other school textbooks than those provided for in this act, "provided, that nothing herein contained shall be construed to prevent the teachers and pupils of this state from using any school textbook other than those provided for in this act as reference books in such schools." Section 7830 makes it a misdemeanor for any person to demand or receive anything above the contract price for adopted books, except the ten per cent allowed local agents and dealers, and provides that any member of any school board in any city of the first or second class

or any teacher of any school who shall adopt, use or permit to be used or cause to be used in any public school of this state any other textbook or books than those provided for in this act shall be deemed guilty of a misdemeanor, and upon conviction by any court of competent jurisdiction shall be fined in any sum not less than $25 nor more than $100, or by imprisonment in the county jail not to exceed ninety days, or by both such fine and imprisonment.

The state board of education, consisting of the state superintendent, the chancellor of the state university, the president of the state agricultural college, the president of the state normal school, and three others appointed by the governor, by and with the consent of the senate, was required by chapter 387 of the Laws of 1905 (Gen. Stat. 1909, § 7498), to prescribe a course of study for the normal institutes and for the public schools of the state, and to revise the same when the interest of the schools should require it; provided, that the course of study for all elementary schools should include all studies required by certain other statutes, which include reading. This board prepared a course of study, a revised edition of which was dated September, 1910, and included a course in reading in the adopted books. On page 12 of this publication a paragraph closes with this sentence:

"If the class can complete this book in less time than suggested, it is a good plan to take up a new book of the same grade."

The opinion of the former attorney-general and superintendent of instruction, under date of November 18, 1908, was to the effect that a school board has the legal right to adopt books to supplement the adopted books, providing the latter are used in good faith and that the former are not made a mere pretext to avoid the use of regularly adopted state texts; that a school board has the legal right to provide a supplemental or

advanced textbook to follow the state text when it has been honestly and properly completed.

It is suggested that, as the findings were sustained by evidence, they can not be set aside. Assuming, however, that they must stand as correct, it remains to be determined whether the conclusions of law are justified thereby. It is well understood that the demand for uniformity of school books, after much public discussion, developed into the statute referred to for the purpose of lessening the expense of books for the use of Kansas pupils and to insure a good quality at a reasonable price. Parents with large families of children, moving from one portion of the state or from one district to another, often found that the books with which they had supplied their children were entirely useless and that new ones must be purchased; that some were of inferior quality, and most, if not all, were charged for exorbitantly. To do away with this crying evil and the burdensome expense incident thereto, the law was passed and the whole matter was placed within the control of the state textbook commission. As said in *The State, ex rel., v. Textbook Commission*, 87 Kan. 781, 125 Pac. 40:

"It is a matter of common knowledge that the principal mischief sought to be avoided by the statute was the lack of uniformity in the books in the same grades of the public schools, which necessitated the purchase of new books for school children when a family moved from one town to another, or from one school district to another." (p. 783.)

The mere authority of the state board of education to prescribe a course of study does not give that board power to amend the statute or control the action of the state textbook commission in respect to the books to be used in the public schools of the state. The law prescribes the books which are to be used, and the board of education merely prescribes the course of study to be followed in such use. The whole question,

therefore, rests upon the meaning of the proviso already quoted, that nothing shall be construed to prevent the use of any school textbooks other than those provided for in this act as reference books in such schools.    It is argued that the intention of the legislature was simply to provide a series of basic texts and permit the use of any sort of books, even other textbooks, for the purpose of reference.    The practical suggestion which would arise in the mind of any father with a half dozen children would be how he had been saved expense by the uniformity act, if in addition to their first and second readers at ten and seventeen cents he should be required to supply them with other readers at two or three times this price, to be used under the guise of reference books.    But it is said that the legislature has given this construction by the language used in section 4 of chapter 267 of the Laws of 1911.    This was an act "relating to boards of education and schools in cities of the first and second class and repealing certain acts and parts of acts in conflict with the provisions hereof."    It relates almost wholly to the election and duties of the boards of education.    Section 4 provides, however:

"That the board of education shall not authorize or permit any teacher or other employee to exclude as a basic text-book any text-book or other adoption now or hereafter adopted under authority of the General Statutes of this state, and any violation of this act shall render the violator liable to the same penalties as prescribed in chapter 179, Laws of 1897."

There is nothing whatever in this title to indicate any intention to amend any portion of the textbook law. Neither does the act contain any language evidencing an effort to modify or impair the general law under which schoolbooks are adopted and their use prescribed.    If this section means anything it is in the nature of a reminder and reinforcement of the penalty section already referred to.    It certainly does not

authorize, in the slightest degree, the use of books other than those prescribed by the textbook commission. The inference to be drawn from the language is that certain boards of education had gone so far as to exclude the adopted books, and had usurped the province of determining for themselves, regardless of the textbook commission, what texts should in fact be used. The use of the word "basic" may be unfortunate, and may have been designed by the person who drafted the section as one for convenient exploitation for future purposes, but it is sufficient to say that a prohibition against excluding adopted books as "basic" books is no license to override the decisions of the textbook commission and evade the law by naming the adopted books "basic" and using others more to the taste of the local board of education for the real purpose of instruction.

The legislature long ago prescribed that "Words and phrases shall be construed according to the context and the approved use of the language." (Gen. Stat. 1909, § 9037, subdiv. 2.) We ordinarily understand by reference books, books to refer to. Webster defines a "reference library" as "A library for public reference, but where the books are not allowed to be taken out." (Webster's New International Dictionary, 1912.) He defines "reference" as an "act of referring, or state of being referred; as *reference* to a chart." He defines "refer": "To bring, carry or send back," and as uses of the word cites: "As to *refer* a student to a book; to *refer* a bill to a committee."

It is plain that in such studies as history, literature or civil government the textbook could naturally and profitably be supplemented by reference to other books on these subjects, in order to obtain broader or different views of other authors. But how one first reader can be used as a reference book by a child learning to read in another is difficult to understand. The common sense of it is that no such result was contemplated,

but that the legislature had in view such studies as might naturally and properly be aided by reference to other books on kindred subjects.

One witness testified that in the second grade they used the adopted reader, Ward's First Reader and Ward's Second Reader; that the teachers had the privilege of doing as they liked; that some began with one book and some with another, the only requirement being that they get through all of them at the end of the year; that much of the work in the Ward books was parallel with that of the adopted books, and some of it preliminary. The witness was unable to state how there could be a uniform system if each board used its own discretion. A teacher testified that she completed the first half of the Ward reader first, using the Ward reader for the entire first six weeks as a text. Another that she used the adopted books and the Ward first reader for the first term, and for the second term using Ward in the morning and the adopted in the afternoon, exercising her own judgment as to what part of the Kansas course to follow.

While it does not appear from the evidence that the pupils or the parents are imperatively required by the local school authorities to purchase the unadopted books, there is no claim that the board purchases them, and we must conclude that the practical effect of the method adopted at Lawrence is that the parents of children in the first and second grades must buy the adopted books at ten and seventeen cents, and the unadopted books at forty and forty-five cents. Should these same parents move to Topeka, and find a board with different notions, requiring books by some other author, and provide them accordingly, and then move to Wichita and find a different requirement, it would doubtless occur to them that uniformity of textbooks in Kansas is more nominal than real.

In 1901 an attempt was made to amend the uniformity act so as to provide for "supplemental" books.

The attempt was a failure. Senator McMillan, in his protest against this provision, said:

"Further, the amendment permitting the use of supplemental textbooks . . . will be found to be the entering wedge in destroying state uniformity, and, whether so intended or so understood by the movers of the same, is so construed by the book trusts, who in reality are behind this fight on the laws which this act will displace. That the changes made in this law will be followed by a gradual and eventually marked increase in the cost of school books to the pupils of this state. For these reasons, I vote No." (Sen. Jour. 1901, p. 895.)

No more insidious, and yet effective manner, of nullifying the statute and bringing back the very burdens it was intended to dissipate could well be devised than the one used in this case. If obedience to the law as it now exists works harm to certain pupils who complete the use of the adopted readers before the close of the term, the legislative and not the judicial department of the government is the one to enact needed amendments. Other courts finding similar situations have spoken to the same effect. (*Westland Publishing Co. v. Royal*, 36 Wash. 399, 78 Pac. 1096; *Wagner v. Royal*, 36 Wash. 428, 78 Pac. 1095; *The State, ex rel. Clark, v. Haworth, School Trustee, Etc.*, 122 Ind. 462, 23 N. E. 946; *The State, ex rel. Roberts, v. The School Directors of Springfield*, 74 Mo. 21.)

As to the attitude of the legal and educational departments, it is proper to say that this action was brought by the present attorney-general, and that former Superintendent Fairchild, in circular No. 122-F, under date of June 30, 1909, was at pains to print the following:

"It is unlawful to use in the schools of Kansas any texts in the subjects named other than the ones adopted by this commission."

The judgment is reversed and the cause remanded with directions to grant the injunction as prayed for.