No. 30,209.

No. 30,210.

THE STATE OF KANSAS, ex rel. J. GLENN LOGAN, as County Attorney, etc., *Appellant*, v. GEORGE A. ALLEN, JR., B. P. WALKER, T. W. BUTCHER, F. D. FARRELL, FRED A. SEAMAN, F. H. MANNING and MRS. JAMES A. RAY, Members of the Kansas State School Book Commission, and WILL J. FRENCH, State Auditor, and B. P. WALKER, State Printer, *Appellees.*

(299 Pac. 630.)

Opinion filed June 6, 1931.

*J. Glenn Logan,* county attorney, and *Edward Rooney,* of Topeka, for the appellant.

*Roland Boynton,* attorney-general, *W. C. Ralston* and *John G. Egan,* assistant attorneys-general, for the appellees.

*Randal C. Harvey,* of Topeka, as *amicus curiæ.*

The opinion of the court was delivered by

DAWSON, J.: In these two cases the state sought to enjoin the members of the state school book commission, the state auditor and

the state printer from carrying into effect certain contracts with the owners of copyrighted materials for use in the publication of certain school textbooks.

In the first of these cases, No. 30,209, the petition alleged that in January of this year the state school book commission made a contract with the John C. Winston Company, a Philadelphia publishing house which owned certain copyrighted materials used in the publication of school textbooks on geography. The gist of that contract was that for the sum of $65,000 in cash to be paid by the commission the Winston company sold to it the right and privilege for five years to use its copyrighted texts on geography with Kansas supplement thereto, in books 1 and 2, and agreed to supply the commission with the requisite electroplates and materials incidental thereto, to enable the state printer to print such textbooks for use in the public schools of this state.

In case No. 30,210 it was alleged that a contract of similar character was made between the commission and the Bobbs-Merrill Company, a publishing concern which owned copyrighted materials used in the publication of school primers and school readers, whereby for the sum of $70,000 in cash the Bobbs-Merrill Company sold to the commission the right and privilege for five years to use its copyrighted texts in the printing and publishing of school primers and school readers, and agreed to supply to the commission the electroplates and materials incident thereto to enable the state printer to print those textbooks for use in public schools.

In each of plaintiff's petitions it was alleged that the contracts were *ultra vires,* illegal and void, and in direct conflict with provisions of statute expressly prohibiting the commission from purchasing any machinery, stock or other material used in the making, printing and manufacture of school books, and likewise in violation of statutory provisions requiring that all mechanical work connected with the manufacture of school books should be done under the supervision of the state printer at the state printing plant.

The petitions also alleged that vouchers for the payment of the stipulated sums under those contracts were in the hands of the state auditor, Will J. French. The prayer in each case was for temporary and permanent injunctions to restrain defendants from carrying the contracts into effect and to restrain the auditor from issuing state warrants for the payment of the stipulated amounts.

The defendant commissioners demurred to the petitions. De-

fendant French, state auditor, filed a separate answer admitting that vouchers for the amounts payable under the contracts had been presented to him for approval, and that he was in doubt about their validity. He raised certain legal questions and invoked the judgment of the court for his guidance.

Temporary restraining orders were issued when the actions were filed. The state moved to expand these into temporary injunctions. The defendant commissioners moved to set them aside. They also demurred to a portion of the separate answer of the state auditor, and moved the court to pass on questions of law in advance of a trial on the facts.

All these motions came on for hearing. Counsel for the several parties stated the legal questions in controversy. Defendants presented evidence. Plaintiff and the auditor introduced no evidence. The trial court made findings of fact and conclusions of law, and delivered a memorandum opinion, and in accordance therewith judgment was entered setting aside the restraining orders, denying temporary injunctions, and final judgments were rendered in favor of the demurring defendants in both cases and against the plaintiff and the state auditor.

The state appeals. The auditor acquiesced in the judgment, but his counsel as *amicus curiæ* filed a brief which this court has carefully perused.

The importance of an early and authoritative determination of the questions involved being apparent in order to avoid delay in furnishing the requisite textbooks on reading and geography when the public schools open this coming autumn persuaded this court to permit the cases to be submitted on a very informal record and without a transcript of the evidence. This method of presenting this appeal has materially increased our task of studying the matters which need to be reviewed, but whatever disputed facts may have been developed in the trial, those were all settled by the special findings or implied in the trial court's judgment; and the only objections now urged against that judgment pertain to legal questions involved in the construction of certain pertinent statutes. Before examining those statutes, it will be helpful to scrutinize the contracts whose validity is challenged in these actions. In case No. 30,209 the evidence shows that on December 19, 1930, the John C. Winston Company addressed a proposition to the commission as follows:

"The John C. Winston Company, of 1006-16 Arch street, Philadelphia, Pennsylvania, incorporated under the laws of Pennsylvania, hereby sub- mits to the Kansas state school book commission the proposal for the use of copyright and the lease of plates for the purpose of publishing and dis- tributing in the state of Kansas and to sell in completed form: Human Geography, by J. Russell Smith, Ph. D., of Columbia University: Book I, Peoples and Countries; Book II, Regions and Trade (with Kansas Supple- ment), for a continued period of five years at the same flat sum bid of five years ago, viz., sixty-five thousand dollars ($65,000). New plates with the figures and statistics of the 1930 census will be furnished free as soon as made available."

The contract made on January 3, 1931, pursuant to the negotia- tions thus initiated, in part, reads:

"Whereas, The party of the second part, acting through its state school book commission, which has been duly convened after full compliance with all the requirements of law, and

"Whereas, The party of the second part [state school book commission] has made a proposal to the party of the first part to purchase from the said party of the first part, for the sum of sixty-five thousand dollars ($65,000), in cash, the right and privilege to use for a term of five years commencing on the 1st day of July, 1931, its textbook in geography, entitled 'Human Geographies,' by J. Russell Smith, Book I, Peoples and Countries, and Book II, Regions and Trade, with Kansas Supplement. It is hereby agreed by parties of the first and second parts that in the payment fifty-five thousand dollars ($55,000) is compensation for geographies I and II, and ten thousand dollars ($10,000) for the Kansas Supplement.

"Now, therefore, the said party of the first part [John C. Winston Com- pany], in consideration of the premises, hereby covenants and agrees with said party of the second part as follows:

"I. That the party of the first part hereby agrees to deliver to the state printer of Kansas, upon his demand and within thirty days, two sets of new electrotype plates of the 1930 revised edition of the Human Geographies One and Two, and to furnish free of charge any subsequent revisions and correc- tions during the life of this contract. Demand for these new plates to be made to the party of the first part in writing and delivery of plates to be made within thirty days or as near that time as possible. All plates are to be subject to the approval of the state printer of Kansas. Defective plates are to be replaced to the state printer free of cost, breakage and reasonable wear and tear excepted.

"II. That it will protect said party of the second part against any and all claims which may be made against it for infringement of copyrights or other- wise because of the use of said plates. That said party of the second part shall have the exclusive right to print and publish said geographies.

"III. That the party of the second part will, at the expiration of this con- tract, return or send to the party of the first part all plates mentioned above that it has received from the said party of the first part and any duplicates that it may have received, without compensation therefor.

"IV. The party of the second part hereby certifies that it has adopted the said geographies for use in the public schools of the state of Kansas as provided by law."

In case No. 30,210 the contract, in part, reads:

"I. That the party of the first part [Bobbs-Merrill Company] agrees to sell to the party of the second part [state school book commission] the right to use the plates and copyrights of the Bobbs-Merrill readers, by Baker and Baker, books one to eight, inclusive, and the Bobbs-Merrill primer, and that it will, on thirty days' notice, deliver to the state printer of the state of Kansas two sets of nickel steel plates, and brass plates for printing the cover, of the Bobbs-Merrill readers, books I to VIII inclusive, and the Bobbs-Merrill primer. That said plates shall be exact duplicates of the pages of the samples of said books heretofore delivered to said state school book commission and shall be of the same wearing qualities, strength and perfect type as the plates used in printing said sample books. All plates are to be subject to the approval of the state printer of Kansas. Defective plates are to be replaced to the state printer free of cost, breakage and reasonable wear and tear excepted. That the Bobbs-Merrill primer is to contain the necessary number work.

"II. That it will protect said party of the second part against any and all claims which may be made against it for infringement of copyrights or otherwise because of the use of said plates. That said party of the second part shall have the exclusive right to print and publish the Bobbs-Merrill readers, books one to eight inclusive, and the Bobbs-Merrill primer, for sale and use in the schools of Kansas.

"III. And said party of the second part, the state school book commission, in consideration of the foregoing, covenants and agrees to pay to said party of the first part seventy thousand ($70,000) dollars for the right to print and publish the Bobbs-Merrill readers and primer, and for two sets of plates, or sixty thousand dollars for the readers and ten thousand dollars for the primer. Party of the second part, the state school book commission, further agrees that it will not print from said plates for sale outside of the state of Kansas.

"IV. Said party of the second part, by said state school book commission, hereby certifies that it has adopted said Bobbs-Merrill readers and primer, by Baker and Baker, for use in the public schools of Kansas, as provided by law."

The evidence disclosed that the parties with whom the commission contracted would not consent to sell the right to publish their texts unless the electroplates furnished by them were used in the printing of the textbooks to which they pertained. There may have been sound business reasons for that attitude on the part of the copyright owners. These same texts were being published by private enterprise for sale throughout the United States and it might discredit those texts if they were printed for use in Kansas in less artistic fashion than the standard which they had set for

the use of these school books throughout the entire country. The state printer does not have the necessary equipment to do electroplating work. The evidence makes it clear that in the development of the printer's art the work of engraving and of electroplating have parted company from that of ordinary printing and bookbinding, and are not ordinarily or conveniently carried on in printing plants. As the publishing business is now conducted electroplating and engraving are regarded as distinct lines of work from that of printing and bookbinding.

. The contract for the copyrighted materials and electroplates to be used in printing and publishing the textbooks on geography is virtually a renewal of a previous five-years' contract with the school book commission. There are hundreds of illustrations which accompany the copyrighted text, many of them multicolored, and each map or colored picture requires a separate plate for each color. The cost of making a set of plates for each colored illustration varies from $100 to $250; a few sets cost $500 per set, and one cost $750. Without going into details, the same situation is presented to some extent in the necessary or desirable use of colored plates in the primers and readers.

The other significant facts in evidence are sufficiently summarized in the trial court's findings:

"1. The state school book commission did not at any time have in its possession or control any plant for the making of electrotype plates or for the making of engravings.

"2. The state printer has not at any time from the year 1913 to the present time, inclusive, had in his possession or control any plant for the making of electrotype plates or for the making of engravings.

"3. A plant for the making of electrotype plates to be used in making school books adopted by the state school book commission and printed by the state printer would cost, to acquire and establish the necessary machinery and apparatus, from thirty to forty thousand dollars, and it would be necessary to permanently employ at least four operators at such plant.

"4. A plant for the making of engravings to be used in making school books adopted by the state school book commission and printed by the state printer would cost, to acquire and establish the necessary machinery and apparatus, from sixty to seventy thousand dollars, and it would be necessary to permanently employ at least five operators at such plant.

"5. From the year 1913 until the present time, inclusive, it has been and is the general practice in the printing trade in Kansas and throughout the United States that electrotype plates have been and are manufactured at separate plants from printing plants, and that engravings of illustrations to be used for printing have been and are manufactured at separate plants from printing plants."

On the pleadings and evidence thus outlined the trial court reached the following conclusions of law:

"1. The court concludes that the defendant, constituting the state school book commission, had a right, in making the contract in question in this case, to obtain the right to use the plates referred to in that contract.

"2. The court concludes that the defendants, constituting the state school book commission, in making the contract in question in this case, had the right to agree to pay for the use of the copyrights and of the plates in question a lump-sum royalty in advance.

"3. That the contract made by the commission is not void because the charge for the right to publish the text of the school books is intermingled with other charges, even though it is impossible to determine whether any of the charges is grossly excessive. That the action of the commission in agreeing to pay a lump sum was not arbitrary and unreasonable."

To determine what, if anything, is wrong with these conclusions of law and the judgment entered thereon requires an examination of pertinent statutes and certain official records.

State publication of textbooks was initiated by the enactment of chapter 288 of the Session Laws of 1913, which created a state school book commission to succeed to the powers formerly exercised by the school textbook commission. The superseded body merely had power to make selections of school books and to adopt uniform series of textbooks for use in public schools. (Laws 1897, ch. 179.) These school books were published by private enterprise. The new commission took over the duties of the older body, but its powers were greatly enlarged. It was authorized to acquire real property and to erect buildings thereon as an addition to the existing state printing plant, so as to permit the expansion of the operations of that institution, and to purchase all needed machinery, type and printing and binding materials for the publishing of school books. The act clearly indicated the state's purpose to embark in the business of printing and publishing school books for use in the public schools of this commonwealth. The act authorized the commission to procure copyrights, or to contract for the right to publish school books on a royalty basis and to provide for the preparation, publication, purchase, sale and distribution of a state series of school textbooks to be sold to patrons of Kansas public schools at cost. Such were the avowed purposes of the statute as expressed in its title.

Section 3 (since amended and consolidated with Laws 1915, ch. 297, § 1; R. S. 72-4101) provided:

"The said school book commission shall, as soon as practicable, adopt, write, select, compile, or cause to be written, or compiled, or purchase copyrights

for a complete series of school textbooks for use in the public schools in the state of Kansas, or may contract for the right to publish any or all of such books on the payment of an agreed royalty therefor. . . ."

Section 4, which is now R. S. 72-4103, in part, provided:

"Said state school book commission shall also have power . . . to contract with authors and publishers upon a royalty basis, upon an exclusive right to publish, and use in the state of Kansas any school textbook written or published by them. The state school book commission shall furnish to the state printer copy and design for all diagrams and illustrations to be used in any school textbook published by the state under the provisions of this act."

Section 5 (R. S. 72-4104) provided:

"The printing of all textbooks published by the state, and provided for in section three of this act, and all mechanical work connected therewith shall be done by and under the supervision of the state printer, at the state printing plant."

Section 12 appropriated $150,000 to purchase grounds, erect necessary buildings, buy necessary machinery, presses, type, and electroplating equipment as may be required in the manufacture of the school textbooks provided for by the act. The same section also appropriated $50,000 to pay authors, artists, compilers, stenographers and to purchase copyrights and plates, and other supplies, to prosecute the work authorized by the act. A revolving fund of $25,000 was also provided to buy paper, printers' and binders' materials, and to pay for labor; and this fund was to be reimbursed from the sales of school textbooks. A contingent fund of $2,000 was also provided to defray certain expenses of the commission. The aggregate of these appropriations was $227,000, and while the statute did not expressly limit the time in which they could be expended, the constitution itself would limit the time to the fiscal biennium ending June 30, 1915. (Const., art. 2, § 24.)

Section 7 (R. S. 72-4106) also provided that the school textbooks published under authority of the act could only be sold to school patrons of this state—a necessary precaution in deference to the constitutional provision which strictly limits the extent to which the state may embark in business ventures. (Const., art. 11, § 8; *State v. Kelly,* 71 Kan. 811, 81 Pac. 450; *State, ex rel., v. Kaw Valley Drainage District,* 126 Kan. 43, 48, 49, 267 Pac. 31.)

The nineteenth biennial report of the state auditor shows how the appropriations which launched the state in the business of furnishing textbooks for use in Kansas public schools were expended. An excerpt from page 44 reads:

"State School Book Commission.  (S. B. 51, Session 1913.)

| For what purpose— | Amount appropriated. | Amount expended. | Unexpended balance. |
|---|---|---|---|
| Ground, buildings, machinery, etc.·.... | $150,000.00 | $7,853.50 | $142,146.50 |
| Authors, artists, compilers, copyrights, stenographers, etc. ................. | 50,000.00 | ........ | 50,000.00 |
| Revolving fund ..................... | 25,000.00 | ........ | 25,000.00 |
| Secretary .......................... | 500.00 | 333.33 | 166.67 |
| Expenses of commission............. | 1,500·00 | 298.52 | 1,201.48 |
| Total ........................... | $227,000.00 | $8,485.35 | $218,514.65" |

The following relating to disbursements during the fiscal year ending June 30, 1914, is shown at page 97:

"State School Book Commission.

| For what purpose— | Amount appropriated. | Amount expended. | Unexpended balance. |
|---|---|---|---|
| Purchase of grounds, erection building, machinery, etc., balance from 1913, | $142,146.50 | $95,924.90 | $46,221.60 |
| To pay authors, artists, compilers, stenographers, to purchase copyrights, plates and other supplies, balance from 1913 ..................... | 50,000.00 | 4,255.00 | 45,745.00" |

The auditor's twentieth biennial report, page 43, shows the disposition of the remainder of the appropriations made in 1913, at the close of the succeeding fiscal biennium, June 30, 1915.  In part it reads:

"State School Book Commission.

| For what purpose— | Amount appropriated. | Amount expended. | Unexpended balance. |
|---|---|---|---|
| Grounds, erection buildings, machinery, etc., balance from 1914........... | $46,221.60 | $30,980.99 | $15,240.61 |
| Authors, artists, compilers, stenographers, copyrights and supplies, balance from 1914.................. | 45,745.00 | 8,069.80 | 37,675.20" |

No material changes of present concern are reflected in the session laws of succeeding legislatures until 1923, when the earlier policy of conducting the book publishing business of the state school book commission was abolished.  Until that time the commission had its own machinery, paper stock, printing and binding materials; and its business, although conducted under the supervision of the state printer and the state printer was himself a member of the commission, was operated independently of the other activities of the state printing plant.

By chapter 10 of the Session Laws of 1923 the legislature decreed that the mechanical end of the school book publication should be under the control of the state printer; the commission should turn

over to him all its machinery, stock and equipment (R. S. 74-303); that the commission itself should no longer engage in the business of making, printing, or manufacturing school books, and that it should cease to purchase equipment and stock for that purpose; that the state printer should pay the commission the original cost of its equipment, stock and materials transferred to his custody; and that he should make, print and manufacture all school books ordered by the commission. (R. S. 74-304.) The same act created a revolving fund of $500,000 to be used by the commission—

". . . For the purpose of the purchase of copyrights, the payment of royalties, payment of authors, compilers, critics, artists, editors, advisers, stenographers, for the purchase of school books and for the payment to the state printer for making, printing and publishing all school books which he may be required to make, print, bind, or manufacture, by said commission as required by law, . . . and all incidental expenses which may be contracted or incurred by said commission in carrying out and into effect their powers and duties as such commission." (Laws 1923, ch. 10, § 1.)

No material changes in the legislative policy set on foot by the statute of 1913 as amended by the statute of 1923 appear. Succeeding legislatures have reappropriated to the use of the commission its revolving fund, as in the instance of Laws 1929, chapter 24. Our attention is directed to the governor's message to the legislature, on January 14, 1931, in which, among other matters, the contracts involved in these lawsuits were discussed, and a legislative investigation recommended. We also note the legislature's response thereto in the adoption of a resolution authorizing the appointment of a committee to investigate all matters pertaining to the school textbooks and relating to the acts and policies of the school book commission in relation thereto. (Laws 1931, ch. 269.) These incidents, however, have to do with matters of public policy which it is the exclusive prerogative of the legislature to authorize, change, or abolish, and are not within our judicial province or concern. Courts must deal with the law as it is, not as it might or should be.

Turning to the appellant's objections to the judgment, the state's main contention is that the commission was not authorized to purchase the right to use the electroplates containing the copyrighted texts on reading and geography. The state's idea is that the commission should have confined its range of purchases to owners or authors of textbook matter in old-fashioned manuscript, so that the labor of setting it in type for printing could be done by work-

men employed by the state printer; or if the textbook matter were desired to be put into electroplate form before printing, the work of making the electroplates would have to be done at the state printing plant.

The statute of 1913 did authorize the commission to provide electroplating facilities, and counsel for the state regard its failure to do so as something mysterious, but there is no mystery about it. It was shown at the trial that it would cost around $100,000 to establish and equip an engraving and electroplating plant and would require the permanent employment of at least nine skilled workmen to operate it. Of course these workmen could not be recruited unless they were employed the year round, and the making of all the electroplates and engravings required for publication of school books would only occupy their time for a portion of the year, not more than a few months. And of course the state could not expand its business of making these plates to serve private customers. The statute forbade it (R. S. 72-4106), to disregard which would imperil the constitutionality of the whole scheme of state publication. (*State v. Kelly*, supra.) It is therefore quite understandable why the authorized facilities for making electroplates were not created at the state printing plant, and why the money appropriated for that purpose was allowed to lapse, as shown in the excerpts from the state auditor's report above quoted.

Appellant cites R. S. 72-4104, which declares that the printing of textbooks and all mechanical work connected therewith shall be done at the state printing plant. That provision does not relate to the making of electroplates which are an integral part of the copyrighted materials prepared for sale or lease according to the modern practice of the school-book publication business. At great expense they could be made in a printing plant specially equipped to do that kind of business. Economically the art of electroplating has developed separately, and neither the statute nor the dictates of common sense forbid the commission or the state printer to refrain from taking advantage of modern methods and business customs in publishing textbooks for Kansas school children. The modern method of owners of copyrighted materials adapted for textbooks appears to be that of engraving or electroplating the subject matter before it is offered for sale to parties desiring to publish it. In other words, the up-to-date idea is to have the literary materials

and illustrations in the exact shape the authors and copyright holders desire it to appear when printed before they will contract to sell it or sell the right to publish it. Should it be declared as a matter of law that in that state of the industry the commission should refrain from dealing with owners and authors of such materials and confine their negotiations to whatever authors and copyright holders they can find who are less up-to-date in their manner of preparing their texts for publication? We think not. The thousands of electroplates which constitute the texts and illustrations for the making of the primers, readers and geographies, the right to publish which was acquired by the commission, are not mere "stock or other material used in making, printing or manufacturing school books" which the commission is forbidden to purchase under R. S. 74-304. Those plates are in substance and effect the copyrighted texts comprising the essential subject matter which the commission is authorized to acquire from owners and authors, under its comprehensive statutory powers quoted above.

In the brief submitted by counsel for the auditor, this court is urged to determine for his guidance whether the state school book commission can contract for the right for five years to publish school books "by the payment of an agreed royalty therefor." A fair reading and interpretation of R. S. 72-4101 and 72-4103 require that an affirmative answer be given to this pertinent question. We regard the term "royalty basis" as too academic for discussion. Every well-informed person should know that "royalty basis" in reference to literary property means the monetary perquisite the publisher has to pay to an author or copyright holder for the privilege of publishing it. The auditor also questions the validity of the agreement to pay for the privilege of publishing an author's or copyright holder's textbook materials in a lump sum. Apparently the statutes already cited contemplate that very thing. The commission is authorized to purchase manuscripts, copyrights and plates. While the record does not show by evidence what the texts and copyrighted materials involved in the contracts under consideration would cost if purchased outright, it needs no evidence to understand that they would cost a vastly greater sum than the commission has to pay for the right to use them for five years in the publication of textbooks for use in Kansas public schools only, and where the owners' rights of publication were not curtailed or infringed throughout the rest of the country.

Some superficially invidious comparisons are made between present costs and prices of school books and those which prevailed in 1913 when the case of *State, ex rel., v. Innes,* 89 Kan. 168, 130 Pac. 677, was decided. It is quite true that in that relatively inexpensive and comfortable age we lived in before the world plunged into the holocaust of war, school books, like almost everything else, were much lower in price than at present. This lawsuit cannot be made to hinge on such points, although it is gratifying to note that the learned trial court found (in a finding which is not contested in this appeal) that the textbooks provided for by the contracts under fire will cost substantially less than they would if the state had to go to the expense of building and equipping its own engraving and electroplating plant and to get together the hundreds of illustrations required for reproduction and use in the printing and publishing of primers, readers and geographies for the half million children who will foregather in the public schools of this commonwealth on the first of next September.

The other arguments urged against the judgment have been duly considered, but they suggest nothing which would warrant its reversal or modification in any respect.

The judgment is affirmed.

SMITH, J., not sitting.